**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFERY SCOTT HARDING, | ) | CASE NO. 5:24-CV-774-BMB |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTATE JUDGE |
| COMMISIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security denied Plaintiff Jeffery Scott Harding's application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). Mr. Harding seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated April 30, 2024.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.    PROCEDURAL HISTORY

### A.    Previous Application

Mr. Harding previously applied for disability benefits, and an ALJ issued a decision denying his claim on January 28, 2021. (Tr. 71–93.)

### B.    Current Application

In March 2021, Mr. Harding applied to the Social Security Administration (SSA) seeking period of disability, DIB, and SSI benefits; he claimed that he became disabled on May 28, 2019

(for SSI benefits) and January 1, 2021 (for DIB). (Tr. 214, 231.)[1] He later amended the alleged onset date on his claims to January 29, 2021, the day after the ALJ's decision denying his previous application. (*See* Tr. 55–56.) He identified one allegedly disabling condition—arthritis. (Tr. 215, 248.)

The SSA denied Mr. Harding's application initially and upon reconsideration. (Tr. 99, 136, 148.) Mr. Harding requested a hearing before an administrative law judge (ALJ). (Tr. 152.) The ALJ held a hearing on May 3, 2023, at which Mr. Harding was represented by counsel. (Tr. 49–70.) Mr. Harding testified, as did an independent vocational expert (VE). (*Id.*)

On June 1, 2023, the ALJ issued a written decision finding that Mr. Harding is not disabled. (Tr. 27–43.)

Mr. Harding requested review of the ALJ's decision. (Tr. 211–12.) His counsel submitted a letter brief to the SSA Appeals Council identifying alleged errors in that decision. (Tr. 296–99.) On April 15, 2024, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On April 30, 2024, Mr. Harding filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Harding asserts the following two assignments of error:

> First Assignment of Error: The ALJ's RFC finding is unsupported by substantial evidence because he failed to properly evaluate the opinion of Dr. Ravishankar.
>
> Second Assignment of Error: The ALJ committed legal error by failing to comply with 20 C.F.R. §§ 404.1529, 416.929 in his analysis of Plaintiff's subjective allegations regarding his ability to stand.

(Pl. Merit Br., ECF No. 8, PageID# 559.)

---

[1] The administrative transcript appears at ECF No. 7. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 43"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 559").

### III.    BACKGROUND

#### A.    <u>Personal, Educational, and Vocational Experience</u>

Mr. Harding was born in September 1962 and was 58 years old on the date of the current application for benefits. (*See* Tr. 57.) He is divorced and has four children. (Tr. 58.) He lives with his mother. (Tr. 57–58.) He graduated high school and attended some college classes; he holds a certificate in hotel and restaurant management from an area university. (Tr. 58.)

Mr. Harding has past relevant work as a hand packager (DOT 920.587-018), a job generally performed at the medium exertional level, but which Mr. Harding performed at the light exertional level. (Tr. 57.) He also has past work as a security guard (DOT 327.667-038) and as an arcade attendant (DOT 342.667-014), both of which were performed at the light exertional level. (*Id.*; *see also* Tr. 249, 287.)

#### B.    <u>Relevant Hearing Testimony</u>

##### 1.    *Mr. Harding's Testimony*

Mr. Harding testified that he experiences "fairly constant pain" in his lower back, pain that makes it difficult to stand or walk for extended periods. (Tr. 59–60.) He estimated that he could walk without assistance for only 15 or 20 feet before needing to take a break. (Tr. 60.) He does not use an assistive device but finds that he leans on furniture when moving around his home and leans on a shopping cart to navigate the grocery store. (Tr. 60–61.) Mr. Harding estimated that he can sit for a half hour before needing to stand up. (Tr. 61.) Mr. Harding is not currently doing anything to treat his back pain beyond taking hot showers; he has tried physical therapy, chiropractors, injections, and pain medicine in the past but did not find them to be helpful. (Tr. 61, 66.)

Mr. Harding had a seizure in May 2019, which caused him to fall and break five ribs. (Tr. 63.) After experiencing seizures in December 2022 and January 2023, his doctor increased the

dosage of levetiracetam (Keppra) prescribed to Mr. Harding. (*Id.*) He did not have a seizure between that medication change and the hearing in May 2023. (*Id.*)

Mr. Harding reported generally good sleep. (Tr. 65.) He is able to manage his personal hygiene without assistance. (*Id.*) He is able to handle laundry, cleaning dishes, cooking, and cleaning his home. (*Id.*) He is able to tackle brief trips to the grocery store and takes his mother to visit siblings "every couple months or so." (*Id.*)

### 2.  *Vocational Expert's Testimony*

Mark Anderson testified as a vocational expert ("VE") at the hearing. (Tr. 66.) The ALJ asked the VE to consider a hypothetical individual with the same age, educational background, and work experiences as Mr. Harding. (Tr. 68.) The ALJ asked the VE to consider that the individual could perform the full range of light work, except that the individual could only occasionally climb ramps and stairs and would never climb ladders, ropes, or scaffolds. (Tr. 68.) The individual could never be exposed to unprotected heights, hazardous machinery, or commercial driving. (Tr. 69.) The VE opined that such an individual could perform Mr. Harding's past relevant work as an arcade attendant and security guard. (Tr. 68.) The VE further testified that the individual could perform Mr. Harding's previous work as a hand packager as Mr. Harding actually performed it, but not as that position is generally performed. (*Id.*)

The ALJ next asked the VE to consider that the individual was more limited, in that the individual must avoid concentrated exposure to humidity, to extreme heat or cold, and to dust, odors, fumes, or other pulmonary irritants. (Tr. 68.) The VE opined that such an individual could still perform Mr. Harding's past relevant work as a security guard and arcade attendant. (Tr. 69.)

The ALJ next asked whether such an individual could perform work that exists in the national economy if the individual would be off-task for 20% of the time and would be absent

three days per month. (Tr. 69.) The VE testified that either of those limitations would be work-preclusive. (*Id.*)

      **C.**    **State Agency Consultants**

      At the initial administrative level, a disability examiner (Kaylah Price) and a physician (Leon Hughes, M.D.) reviewed Mr. Harding's claim. (Tr. 99–112.) Dr. Hughes found that Mr. Harding's statements about the intensity and limiting effect of his low-back pain were only partially consistent with the record evidence. (Tr. 104.) Specifically, Dr. Hughes noted that a clinical examination found that his strength, gait, and range-of-motion were all normal and that Mr. Harding did not appear to be in distress during the examination. (*Id.*) Dr. Hughes opined that Mr. Harding can perform light work with several additional functional limitations. (*Id.*) The consultants found that these limitations would allow Mr. Harding to perform his past relevant work as a security guard/arcade attendant. (Tr. 105.) They therefore concluded that Mr. Harding is not disabled. (*Id.*)

      At the reconsideration level, a physician (Mehr Siddiqui, M.D.) opined that the medical findings at the initial level were "consistent with and supported by the totality of the evidence available in the file, including the updated evidence received at the reconsideration level." (Tr. 116.) Dr. Siddiqui and a disability examiner (Reece Wolford) therefore affirmed the finding that Mr. Harding was not disabled. (Tr. 117.)

      **D.**    **Relevant Medical Evidence**

      An MRI in May 2019 revealed a likely meningioma in Mr. Harding's brain; mild to moderate small-vessel ischemic changes and parenchymal volume loss were also noted. (Tr. 300–01.) CT imaging confirmed that Mr. Harding had multiple rib fractures after a fall. (Tr. 303.)

Mr. Harding consulted with Dr. Venkatesan Ravishankar, M.D., on August 9, 2019. (Tr. 327.) Dr. Ravishankar assessed that Mr. Harding had uncontrolled hypertension and increased the dosage of a beta blocker. (*Id.*) No complaints about back pain were noted. (*See id.*)

At a follow-up appointment with Emily Waight, PA-C on September 26, 2019, Mr. Harding was in no acute distress his gait and station were normal. (Tr. 312.) He complained of no back pain or muscle weakness. (Tr. 311.)

A follow-up MRI in October 2019 revealed no mass suggesting meningioma; the scan noted "[n]o acute intracranial abnormality," although some small areas of damage "likely related to prior trauma." (Tr. 317–18.) An EEG in October 2019 was normal. (Tr. 321.)

Mr. Harding consulted with Dr. Ravishankar on November 11, 2019, for an annual wellness examination. (Tr. 325.) Dr. Ravishankar made no abnormal findings, although he was noted to have hypertension. (Tr. 325–26.) Mr. Harding was counseled to get "at least a few hours each week of moderate aerobic ex[ercise.]" (Tr. 326.) Mr. Harding noted that he was ambulating, shopping, and housekeeping independently. (Tr. 325.)

No back complaints were noted in examinations with Dr. Ravishankar in January and February 2020. (*See* Tr. 459, 461.)

In July 2020, Mr. Harding consulted with Dr. Ravishankar, complaining of lower back pain, among other things. (Tr. 323.) Dr. Ravishankar assessed that Mr. Harding was in no acute distress; Mr. Harding denied muscle weakness. (*Id.*) Dr. Ravishankar opined that Mr. Harding probably had "disc prolapse." (*Id.*) He ordered additional tests and scheduled Mr. Harding for a follow-up appointment in two weeks. (*Id.*)

Mr. Harding underwent imaging of the lower back, which found "[m]ultilevel degenerative disk disease and facet arthropathy." (Tr. 353.)

Mr. Harding presented to the emergency room on July 28, 2020, complaining of swelling in his neck (Tr. 340.) He denied back pain at the appointment. (Tr. 341, 347.) The doctor assessed that the swelling was not a blood clot but could not determine a cause. (Tr. 342.)

Mr. Harding consulted with Dr. Ravishankar on August 3, 2020. (Tr. 378.) Dr. Ravishankar does not note that Mr. Harding complained of back pain at this appointment. (*See id.*)

Mr. Harding consulted with Dr. Ravishankar on November 10, 2020. (Tr. 370.) Dr. Ravishankar noted that Mr. Harding's blood pressure was still uncontrolled and increased the dosage of his medication. (*Id.*) It was noted that Mr. Harding was still complaining of low back pain and Dr. Ravishankar made a medication change. (*Id.*) Mr. Harding reported that he was "doing well." (*Id.*)

Mr. Harding consulted with Dr. Ravishankar in a telephone appointment on December 17, 2020. (Tr. 369.) It was noted that Mr. Harding's heart rate was low, which the doctor attributed to one of his medications. (*Id.*)

Mr. Harding consulted with Dr. Ravishankar on January 14, 2021. (Tr. 368.) Mr. Harding's blood pressure was "fine" and Mr. Harding was told to follow up in three months. (*Id.*)

Mr. Harding consulted with Dr. Ravishankar on April 19, 2021. (Tr. 365.) Mr. Harding complained of back pain that was not responding to the anti-inflammatory drug naproxen. (*Id.*) Dr. Ravishankar noted no abnormality in Mr. Harding's gait. (Tr. 366.)

Mr. Harding underwent a consultative examination with Bilal Mahmood, M.D., on June 5, 2021, for purposes of his disability application. (Tr. 384–92.) Dr. Mahmood noted that Mr. Harding reported pain of an intensity of seven out of ten, which he said he has had since falling in May 2019. (Tr. 384.) Mr. Harding complained that anti-inflammatory medication and physical therapy had not helped. (*Id.*) On examination, Mr. Harding reported tenderness "of the bilateral paraspinal

muscles of the lumbosacral junction without any radicular symptoms." (Tr. 385.) Dr. Mahmood also noted "mild evidence of paravertebral muscle spasm on the dorsolumbar exam of the paraspinal muscles." (*Id.*) Dr. Mahmood opined that Mr. Harding suffers from chronic low back pain and "[h]is ability to perform work-related activities is at least mildly impaired secondary to the objective findings listed above." (Tr. 386.)

But Dr. Mahmood assessed that there was no abnormality or deformity of the cervical or thoracic spine, or of the dorsolumbar spine. (Tr. 385.) Dr. Mahmood further assessed that Mr. Harding had full range-of-motion and normal strength (five out of five) in all respects on examination. (Tr. 387–91.) Mr. Harding was able to "heel walk, toe walk, stand on one foot, and hop on one foot bilaterally"; his gait was described as "nonantalgic." (Tr. 385.)

At an appointment with Dr. Ravishankar on July 19, 2021, it was noted that Mr. Harding's back pain had not improved with physical therapy; Dr. Ravishankar referred Mr. Harding to an orthopedic practice group. (Tr. 439.)

Mr. Harding consulted with Hannah R. Laslo, PA-C, at the orthopedic clinic on August 23, 2021. (Tr. 404.) Mr. Harding complained of pain at an intensity of between four and seven out of ten, which are aggravated with standing, changing positions, and lying down. (*Id.*) Ms. Laslo assessed that Mr. Harding had full range of motion and normal sensation and reflexes. (Tr. 406.) After reviewing x-ray imaging, Ms. Laslo assessed that Mr. Harding had moderate degenerative disc disease with osteophyte formation; she referred him for an MRI. (Tr. 404, 406–07.)

Mr. Harding underwent MRI imaging on the lower spine in September 2021. (Tr. 401–02.) The imaging revealed suspected "minimal retrolisthesis" at the L5/S1 level; "mild circumferential disc bulging with tiny osteophytes" at the L2/L3 level' "circumferential disc bulging with small osteophytes" at the L3/L4 level with "minimal narrowing of the central canal"; "[m]ild

degenerative facet changes" and "minimal posterior disc bulging" at the L4/L5 level; and "mild to moderate degenerative facet changes" with "a small broad-based posterior disc osteophyte complex, "[m]inimal narrowing of the central canal," "mild encroachment on the lateral recesses" and "mild bilateral foraminal narrowing" at the L5/S1 level. (Tr. 401–02.)

Mr. Harding consulted with Dr. Ehrler on September 17, 2021. (Tr. 409.) Mr. Harding reported "back pain that has occasionally radiated into his buttocks" and denied numbness and tingling. (*Id.*; *but see* Tr. 410 (indicating a positive report of numbness and tingling)). He reported that his symptoms were worse with standing. (*Id.*) Dr. Ehrler interpreted the recent MRI results to indicate bilateral foraminal stenosis at the L5–S1 area with "[n]o gross motion, defects, or step offs." (*Id.*) Dr. Ehrler's physical examination was "good," and it was recommended that Mr. Harding receiving an epidural injection. (Tr. 411.)

Mr. Harding complained in October 2021 of numbness in his hands that "comes and goes"; Dr. Ravishankar merely noted that Mr. Harding was seeing an orthopedic doctor regarding the issue. (Tr. 437.)

Mr. Harding followed up with Jamesetta Holloway Lewis, D.O., on October 12, 2021. (Tr. 515.) Mr. Harding stated that he had dealt with chronic back pain for around three years and that physical therapy did not help. (*Id.*) He rated his pain as a six out of ten with respect to intensity. (*Id.*) It was noted that Mr. Harding was not using a cane or walker to ambulate and was not in acute distress. (Tr. 519.) He had normal strength in both legs but had "[d]iminished L4 and S1 reflexes bilaterally." (*Id.*) His range of motion was largely normal, but he had diminished lumbar extension and tenderness in the midline paraspinal muscles. (*Id.*) He was able to "[t]oe and heel walk[]" normally and had good balance. (*Id.*)

Mr. Lewis met with Dr. Lewis on November 17, 2021. (Tr. 509.) He received a spinal injection. (Tr. 510.)[2]

Mr. Harding met with Dr. Lewis again on December 1, 2021. (Tr. 492.) It was noted that Mr. Harding's pain had "improved some" and that in the three or four hours after the last injection, he had "greater than 80% pain relief." (*Id.*) He identified his current pain as a five out of ten in severity. (*Id.*) Dr. Lewis prescribed new tablet medications. (Tr. 495.)

Mr. Harding met with Dr. Lewis again on December 8, 2021. (Tr. 484.) Dr. Lewis rated Mr. Lewis as having "mild disease" (one step worse than "healthy patient"). (*Id.*) Mr. Harding received a lidocaine injection in his spine. (Tr. 485.)

At an appointment with Dr. Ravishankar on January 17, 2022, it was noted that Mr. Harding was "doing well" and that his "back pain [wa]s better." (Tr. 435.)

Dr. Ravishankar completed an impairment questionnaire for Mr. Harding on January 23, 2022. (Tr. 447–50.) The doctor identified that Mr. Harding had discomforting pain in his low back and spinal stenosis. (Tr. 448.) He identified hypertension and "COPD" among Mr. Harding's "other relevant factors." (*Id.*; *see also* Tr. 450.) Dr. Ravishankar opined that Mr. Harding would be able to sit for one to two hours in an average workday; he could only occasionally lift and carry items that were less than five pounds (and never anything heavier); he was precluded from reaching, handling, and fingering; and he would likely miss one day per month. (Tr. 449–50.)

At an appointment with Dr. Ravishankar in May 2022, Mr. Harding assessed his health as the "same" as it was in May 2021. (Tr. 473.) It was noted that Mr. Harding was independently

---

[2] It is noted in several medical records from this practice that Mr. Harding denied back pain and arthritis, a curious note that seems likely to have been an error considering the nature of these procedures. (*See* Tr. 488, 513, 518.)

seeing to his hygiene, ambulating, shopping, preparing meals, housekeeping, and transporting himself places. (*Id.*) A physical examination was normal. (Tr. 474.)

Mr. Harding was again "doing well" at an appointment with Dr. Ravishankar in August 2022. (Tr. 471.)

At an appointment with Dr. Ravishankar in November 2022, it was noted that Mr. Harding was "doing ok" and had not been seeing a "pain doctor." (Tr. 451.)

Mr. Harding met with Dr. Ravishankar again in March 2023. (Tr. 467.) While it was noted that Mr. Harding had experienced two seizures, there was no indication of a complaint of back pain beyond a note that Mr. Harding had "chronic pain." (*Id.*)

Dr. Ravishankar completed another impairment questionnaire for Mr. Harding in April 2023. (Tr. 479–82.) Dr. Ravishankar opined that Mr. Harding suffered from back pain and tingling in the lower extremities. (Tr. 479.) He opined that Mr. Harding's pain was triggered by sitting or standing for too long and was "moderate" in severity. (Tr. 480.) He again listed COPD among Mr. Harding's health conditions. (*Id.*) He noted that Mr. Harding experienced drowsiness from his medication, but he did not identify the drug causing that side effect. (*See id.*) Dr. Ravishankar further opined that Mr. Harding could sit or stand/walk for less than one hour each in a typical workday, would need "to alternate positions due to discomfort from spinal stenosis," would need to elevate his legs while sitting for half the workday,[3] and would have to stretch and move around. (Tr. 480–81.) Dr. Ravishankar further opined that Mr. Harding would need to lie down "very often" during the workday, resting for 15 minutes at a time. (Tr. 481.) He kept the same weight limitations

---

[3] Mr. Harding argues in his reply brief that this note does not require leg elevation. Dr. Ravishankar checked a box saying that Mr. Harding did not have to elevate his legs, then wrote "50%" when prompted to indicate the amount of time Mr. Harding would need to elevate his legs; Dr. Ravishankar wrote in the margins that Mr. Harding would need to get up, stretch, and move around.

as in his previous opinion, but he opined that Mr. Harding could occasionally reach and frequently handle and finger bilaterally. (Tr. 481–82.) Dr. Ravishankar wrote that Mr. Harding would require unscheduled breaks every hour or so, for fifteen minutes at a time. (Tr. 482.) He expected Mr. Harding to be absent two to three times per month. (*Id.*)

## IV.    THE ALJ'S DECISION

The ALJ determined that Mr. Harding had not engaged in substantial gainful activity since January 29, 2021, the alleged disability onset date. (Tr. 31.)

The ALJ next determined that Mr. Harding had the following severe impairments: degenerative disc disease, spinal stenosis, radiculopathy of the lumbar spine, and seizure disorder. (*Id.*)

The ALJ also noted that Mr. Harding had the following non-severe impairments: hypertension and "mild" diastolic heart dysfunction; benign brain tumor (meningioma); and obesity. (*Id.*) While the ALJ found these conditions to be non-severe, the ALJ noted that he considered all these conditions when determining Mr. Harding's residual functional capacity. (Tr. 32.)

The ALJ determined that none of Mr. Harding's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ further determined that Mr. Harding had the residual functional capacity ("RFC") to:

> perform light work . . ., except that he is further limited in the following nonexertional respects:
>
> -    Can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs, and can occasionally balance, stoop, crouch, kneel, and crawl; and

- Can never be exposed to unprotected heights, hazardous machinery, or commercial driving.

(Tr. 33.)

The ALJ found that Mr. Harding was able to perform his past relevant work as a "hand packager" (DOT 920.587-018) and in the composite job as a "security guard"/"arcade attendant" (DOT 372.667-038 and 342.667-014). (Tr. 42.)

Accordingly, the ALJ determined that Mr. Harding is not disabled. (Tr. 43.)

## V.      LAW & ANALYSIS

### A.      <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

## B. <u>Standard for Disability</u>

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of

impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her

from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.     **Analysis**

Mr. Harding's assignments of error essentially target the ALJ's conclusion that Mr. Harding's "alleged limitations . . . due to chronic back pain and radicular pain . . . remain unsupported by and overall inconsistent with many other aspects of the objective medical evidence and with other medical factors relating to treatments and his own statements made to his primary care doctor and to the specialists seen over August 2021 – December 2021." (Tr. 36.) Mr. Harding argues that, in reaching this conclusion, the ALJ failed to properly consider his primary-care doctor's medical opinions and his own subjective testimony about his pain and related limitations. Thus, he says, the ALJ's RFC is not supported by substantial evidence.

As noted above, the standard for "substantial evidence" is "not high." *Biestek*, 139 S.Ct. at 1154. "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Here, for the reasons discussed further below, and after careful review, I find that the ALJ's conclusions fell well within the appropriate "zone of choice" such that the decision should stand

without judicial interference. I therefore recommend that these assignments of error be overruled.

## 1.    *First Assignment of Error – Step Four: Supportability and Consistency*

In his first assignment of error, Mr. Harding contends that the ALJ failed to properly consider the medical opinions of Dr. Ravishankar in crafting the RFC. (Pl. Merits Br. at 12–16, ECF No. 8, PageID# 569–73.)

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).[4]

According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)–(2).

Here, in discussing Dr. Ravishankar's assessment, the ALJ reasoned as follows:

> On January 23, 2022 and again on April 20, 2023, Dr. V. Ravishankar responded to a questionnaire from the claimant's representative regarding limitations in physical and other work-related abilities. The undersigned has considered both opinions together pursuant to 20 CFR 404.1520c(b)(1) and 416.920c(b)(1).

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)–(5).

Dr. Ravishankar initially opined that the claimant can sit for up to two total hours in a workday, but dropped this in April 2023 to less than one hour of maximal sitting ability and added that the claimant can stand and/or walk for not even one hour in a workday, "will have to alternate positions" (citing discomfort from spinal stenosis), must also stand up and move around, must keep his legs elevated for 50% of the time when sitting, and "very often" and for 15-minute periods must lie down. He also opined that the claimant can lift or carry no more than five pounds occasionally and never anything heavier than such weight. As to nonexertional abilities, Dr. Ravishankar stated that the claimant should avoid stooping and is "precluded" from reaching, handling, and fingering with the upper extremities—and yet, in April 2023, contrastingly found the claimant capable of occasional reaching and of frequent handling and fingering bilaterally. Lastly, Dr. Ravishankar assessed frequent interference by symptoms, including pain, with attention and concentration, a need for hourly 15-minute rest breaks due to symptoms, and one monthly absence (January 2022) up to three monthly absences (April 2023).

Dr. Ravishankar's medical opinions are **not persuasive** for many reasons. First, while offering good prognoses with respect to the diagnosis of seizure disorder with ongoing medication compliance, Dr. Ravishankar based most of his opinions on the claimant's "spinal stenosis" and associated back pain, adding a new symptom of tingling pain in the lower extremities to the April 2023 opinion that, frankly, is not shown as ever reported to him by the claimant. He cited "level 4–5" for the stenosis, which is not entirely accurate to the September 2021 MRI showing L5-S1 as the mainly affected disc level; he also cited COPD (chronic obstructive pulmonary disease) as a diagnosis for the claimant, which was not only denied when asked at the May 2023 hearing but also has no corresponding mention even in recited past medical history within his own 2021–2023 office notes; and he further cited for support "drowsiness" as a side effect from medication(s), which he cared not to specify the name(s) of and, regardless, is not corroborated by any of his office notes. In short, direct support offered by Dr. Ravishankar for the January 2022 and April 2023 medical opinions bears many incongruities with his own office notes, which is a major reason to find the extreme exertional and other work-related functional limitations therein to be unpersuasive.

Second, Dr. Ravishankar broadly cited to "all testing attached" / "office notes attached" for other support to his opinions, but none of their contents plausibly support the extreme standing, walking, sitting, lifting and carrying, and other work-related limitations. By way of example, Dr. Ravishankar continually recorded normal gait throughout the 2021–2022 timeframe, recorded full range of motion in the extremities, and otherwise endeavored no focused musculoskeletal examinations of the back/lumbar spine to lend strong support to his opinions. No explanation was offered for

several aspects of his opinions, such as why the claimant must elevate the legs 50% of the time when sitting, why he should avoid stooping, and why he would be "precluded" from or otherwise limited in any way for using the upper extremities to reach, to handle, and to finger. Furthermore, both opinions are not well supported by Dr. Ravishankar's own 2022 office notes recording express subjective reports of "doing well" and specifically having "better" back pain after the two injections done through pain management, "independently" doing all activities of daily living ("ADL/IADL"), and through November 2022 follow-up doing "ok" even though he was no longer seeing the "pain doctor" and was not even taking any anti-inflammatory or other medication(s) to manage pain.

Lastly, Dr. Ravishankar's opinion is inconsistent with the orthopedic and pain-management specialists' clinical observations and objective signs on examinations done over August 2021 – October 2021, including (but not limited to) full 5/5 strength in the lower extremities, full 90 degrees of forward flexion mobility retained at the lumbar spine, and no elicited radicular pain on straight-leg raising test, and with the unremarkable signs and observations recorded in June 2021 consultative physical examination by Dr. Mahmood.

(Tr. 40–41 (emphasis in original) (internal citations to the record omitted).)

Mr. Harding implicitly concedes that the ALJ articulated his consideration of both the supportability and consistency factors. He instead points to several discrete findings contained within that analysis, arguing that those findings are inaccurate and therefore that the ALJ's conclusion with respect to Dr. Ravishankar's opinions is not supported by substantial evidence.

With respect to supportability, Mr. Harding takes issue with (1) the ALJ's characterization of Dr. Ravishankar's listed symptom of numbness and tingling in April 2023 as a "new symptom" that "frankly, is not shown as ever reported to [Dr. Ravishankar]"; (2) the ALJ's characterization of Dr. Ravishankar's identified spinal problem area as L4–5 as "not entirely accurate"; (3) the ALJ's reasoning that the opinion is less reliable because Dr. Ravishankar diagnosed chronic obstructive pulmonary disorder when that diagnosis "has no corresponding mention" in the office notes; and (4) the ALJ's reasoning that the opinion that Mr. Harding had suffered from medication-caused drowsiness was not supported by any identification of the medication allegedly causing

that symptom and further was not supported "by any of his office notes."

With respect to consistency, Mr. Harding argues that Dr. Ravishankar's opinions were consistent with the medical evidence because (1) Dr. Mahmood found tenderness to palpitation in the paraspinal muscles; (2) an x-ray image showed moderate degenerative disc disease with osteophyte formation; (3) an MRI showed bilateral foraminal stenosis; and (4) an orthopedic doctor found diminished L4 and L5 reflexes, limited lumbar extension, and tenderness.

The Commissioner defends the ALJ's conclusion about Dr. Ravishankar's medical opinions, noting that the ALJ discussed both supportability and consistency and reasonably concluded that the opinion was not persuasive for "several valid reasons, grounded in the record . . . ." (Def. Merits Br. at 8, ECF No. 10, PageID# 585.)

After a careful consideration, I agree that the ALJ's determinations regarding the supportability and consistency factors are supported by substantial evidence.

With respect to supportability, Mr. Harding admits that Dr. Ravishankar's notes "do not contain many objective findings." (Pl. Merits Br. at 13, ECF No. 8, PageID# 570.) This lack of objective findings in office notes was a primary reason that the ALJ found the opinion to be unpersuasive. (*See* Tr. 41 ("Dr. Ravishankar broadly cited to "all testing attached" / "office notes attached" for other support to his opinions . . . but none of their contents plausibly support the extreme . . . limitations.") The ALJ, furthermore, pointed out that the office notes routinely recorded normal gait and full range of motion, yet Dr. Ravishankar opined that Mr. Harding had disabling limitations with respect to standing and sitting. The ALJ further pointed out that Dr. Ravishankar's notes endorse improvement in Mr. Harding's back symptoms after pain-management treatment, such that as of November 2022 Mr. Harding noted that he was doing "ok" despite not taking any current pain-management treatment, yet the doctor opined that Mr. Harding

could be expected to be absent up to three times per month and would need frequent breaks because of pain.

The identified incongruities find sufficient support in the record. *See Rattliff v. Comm'r of Soc. Sec.*, No. 1:20-cv-01732, 2021 WL 7251036, at *9 (N.D. Ohio Oct. 29, 2021), *report and recommendation adopted*, 2022 WL 627055 (N.D. Ohio Mar. 3, 2022) (holding that an ALJ addressed supportability factor by noting that a physician's opinion was inconsistent with physician's treating notes).

Mr. Harding's complaints about several of the ALJ's findings do not convince me that the ALJ's supportability conclusion was based on less than substantial evidence. For example, Mr. Harding defends Dr. Ravishankar's diagnosis of COPD solely because office notes reflect that Mr. Harding is a longtime cigarette smoker. Mr. Harding further does not dispute that Dr. Ravishankar failed to note which medication was causing the alleged drowsiness, but essentially argues that the answer is obvious because drowsiness is a known side effect of Flexeril and Keppra, which Mr. Harding had been prescribed.

Again, a reviewing court cannot overturn the decision of the ALJ so long as it is supported by substantial evidence, even if other evidence in the record would support a different conclusion. *Jones*, 336 F.3d at 477. Here, the ALJ's finding with respect to supportability is adequately supported.

With respect to consistency, the medical evidence upon which Mr. Harding relies supports a conclusion that the *diagnosis* of spinal stenosis is consistent with medical imaging, but that evidence lends little support to a conclusion that Dr. Ravishankar's opined disabling functional limitations are consistent with that imaging. As the ALJ correctly noted, while other doctors confirmed the diagnosis and assessed some tenderness in the paraspinal muscles, it was

routinely noted that Mr. Harding retained full strength and range of motion in his spine and extremities. The ALJ also correctly found Dr. Ravishankar's opined limitations inconsistent with the opinions of state medical consultants with respect to the limitations stemming from Mr. Harding's spinal condition.

In short, while Mr. Harding cites evidence that he believes is consistent with Dr. Ravishankar's opinions, the ALJ's determination regarding the consistency factor is also supported by substantial evidence.

Because the ALJ's consideration of Dr. Ravishankar's medical opinions was supported by substantial evidence with respect to both supportability and consistency, I recommend that the Court reject Mr. Harding's first assignment of error.

### B.  *Second Assignment of Error – Credibility of Reported Symptoms*

In his second assignment of error, Mr. Harding contends that the ALJ failed to properly analyze his subjective descriptions of his symptoms and limitations with respect to his ability to stand. (*See* Pl. Merits Br. at 17–18, ECF No. 8, PageID# 575–76.)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed. App'x 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3 (6th Cir. Feb. 7, 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).[5]

---

[5] The Social Security Administration ("SSA") previously characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination. *See* SSR 96-7p, 1996 SSR LEXIS 4 (July

In evaluating a claimant's symptoms at the second step of the analysis, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider. These factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7.

The ALJ is not required to discuss each of these factors or even all the evidence in the record but need only acknowledge the factors and discuss the evidence that supports his decision. *See Bryson v. Comm'r of Soc. Sec.*, 2021 WL 2735993 at * 14 (N.D. Ohio June 10, 2021), *adopted by*, 2021 WL 2720071 (N.D. Ohio July 1, 2021). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL

---

2, 1996). In March 2016, however, the SSA issued SSR 16-3p. Therein, the SSA explained that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-regulatory policy. *See* SSR 16-3p, 2016 WL 1119029 (Oct. 25, 2017). The SSA explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record. SSR 16-3p, 2016 WL 1119029. Despite these changes in terminology, courts have concluded that SSR 16-3p did not substantially change existing law on this issue. *See Banks v. Comm'r of Soc. Sec.*, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting language in SSR 16-3p that states intention to "clarify" and not to substantially "change" existing SSR 96-7p), adopted at 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

1119029 at * 9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").

An ALJ is not required to accept the claimant's complaints at face value but may discount them based on his consideration of the above factors. *See Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 (6th Cir. 2016); *Bryson*, 2021 WL 2735993 at *15. In light of the ALJ's opportunity to observe the claimant's demeanor, the ALJ's evaluation of a claimant's subjective symptoms is entitled to considerable deference and should not be discarded lightly. *See Dooley*, 656 Fed. App'x at 119 ("[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'") (*quoting Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Jidas v. Comm'r of Soc. Sec.*, 2019 WL 2252289 at *8–9 (E.D. Mich. Feb. 26, 2019), *adopted by*, 2019 WL 1306172 (E.D. Mich. March 22, 2019). Indeed, a reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001); *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017) (noting that "while an ALJ's credibility determinations must be supported by substantial evidence, we accord them special deference"); *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (noting that, "in practice ALJ credibility findings have become essentially 'unchallengeable.'"); *Riebe v. Comm'r of Soc. Sec.*, 2019 WL 4600628 at * 7–8 (N.D. Ohio Sept. 23, 2019) (same).

Here, the ALJ summarized Mr. Harding's written statements and hearing testimony and

concluded that Mr. Harding's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that "his statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 34.)

Mr. Harding argues that the ALJ's conclusion improperly discredits that (1) he reported to Dr. Mahmood that he cannot stand for more than ten minutes without significant pain, and Dr. Mahmood opined that Mr. Harding's ability to perform work activities was "at least mildly impaired"; (2) Mr. Harding reported to Ms. Laslo and Dr. Ehrler that his back pain was aggravated by standing; (3) Dr. Ravishankar wrote that standing too long led to more pain; (4) Mr. Harding testified that pain makes it difficult for him to perform extended standing; and (5) Mr. Harding reported to state examiners that he cannot stand longer than 15 minutes and requires frequent breaks.

The Commissioner responds that the ALJ acknowledged Mr. Harding's subjective statements about his pain but adequately "detail[ed] the evidence that led [the ALJ] to conclude that [these] allegations were 'not entirely consistent' with the record." (Def. Merits Br. at 8–9, ECF No. 10, PageID# 585–86.)

After careful consideration, I agree with the Commissioner that the ALJ complied with the regulations in his analysis of Mr. Harding's subjective descriptions of his pain and limitations and that the ALJ's conclusions with respect to those descriptions is supported by substantial evidence.

The ALJ did not "cherry-pick" evidence to support a finding that Mr. Harding was not disabled. To the contrary, the ALJ carefully and accurately summarized the medical records in evidence (Tr. 35–38) and correctly concluded that Mr. Harding's reported symptomology was partially, but not fully, consistent with the record evidence. (Tr. 34.)

Contrary to Mr. Harding's arguments in this case, the ALJ acknowledged that Mr. Harding complained of low back pain to Dr. Mahmood, stating that medication and physical therapy had not helped to relieve that pain. (Tr. 35.) The ALJ accurately summarized Mr. Harding's statements to his doctors and to state medical examiners. (Tr. 35–36.) And the ALJ fairly concluded that the medical records support that Mr. Harding was experiencing "persistent and more limiting back pain attributable to lumbar DDD along with more recently diagnosed spinal stenosis and radiculopathy than shown in the prior ALJ's finding." (Tr. 36.)

The ALJ factored in additional limitations, then extensively discussed why he nevertheless found that Mr. Harding's allegation that his pain was severe enough to be disabling was inconsistent with his activities and the medical evidence. *See Pifer v. Comm'r of Soc. Sec.*, Case No. 1:21-CV-00314-CEH, 2022 WL 1521911, * (N.D. Ohio May 13, 2022) (affirming where the ALJ considered the claimant's subjective allegations and gave a thorough explanation as to why he found those allegations inconsistent with his activities and the medical evidence). While acknowledging that Mr. Harding reported to his doctors, state medical examiners, and at his hearing that he had only a very limited ability to stand—Tr. 33–34—the ALJ correctly noted that Mr. Harding routinely presented to examination with a normal gait, in no distress, and with full range of motion. (Tr. 36.) The ALJ noted that Dr. Mahmood assessed that Mr. Harding—despite the spine tenderness—retained full strength and range of motion and was able to heel walk, toe walk, and stand and hop on both feet. (*Id.*)  The ALJ pointed out that at various points Mr. Harding was recorded to have benefitted from treatment and even stated that he was doing well without treatment. (Tr. 37.) And the ALJ's RFC was consistent with the opinions of the state agency consultants at the initial and reconsideration level.

The ALJ's decision addresses Mr. Harding's subjective complaints and explains why those

complaints are not entirely consistent with the record. I am convinced that the ALJ considered all the relevant evidence and that a reasonable mind might accept the record evidence as adequate to support the ALJ's findings. I am convinced that there is no compelling reason for the Court to disturb the ALJ's findings. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

Accordingly, Mr. Harding's second assignment of error is without merit.

## VI.   RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated:  January 7, 2025                              /s *Jennifer Dowdell Armstrong*
                                                     Jennifer Dowdell Armstrong
                                                     U.S. Magistrate Judge

## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).